**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **SPEEDSPORTZ, LLC, an Oklahoma limited liability company,** | )<br>)<br>) |
| **Plaintiff,** | )<br>) |
| v. | ) Case No. 07-CV-624-TCK-TLW<br>) |
| **MENZEL MOTOR SPORTS, INC., a California corporation, and ALEX MENZEL, an individual,** | )<br>)<br>)<br>) |
| **Defendants.** | ) |

**OPINION AND ORDER**

Before the Court is Defendant Alex Menzel's Motion to Dismiss ("Motion to Dismiss") (Doc. 37). For reasons explained herein, the Motion to Dismiss is granted.

**I.    Background**

In its First Amended Complaint, Plaintiff Speedsportz, LLC ("Speedsportz"), an Oklahoma corporation, alleged that it owns a 1957 Mercedes 300SL Convertible Roadster ("Mercedes"). Speedsportz further alleged that, in March of 2007, Defendant Menzel Motor Sports, Inc. ("Motor Sports"), a California corporation, "set about a course of conduct to do extensive repair work" on the Mercedes ("repair work") (First Am. Compl. ¶ 2.) Speedsportz alleged that the repair work was not completed in a reasonably competent manner and asserted three causes of action under Oklahoma law: (1) negligent injury to property, (2) breach of contract, and (3) breach of the implied duty to complete repairs in a workmanlike manner.

On July 2, 2008, the Court entered a scheduling order setting a deadline of July 30, 2008 for motions to join or amend. Speedsportz filed a motion to amend on July 15, 2008 ("Motion to Amend"), seeking to add Alexander Menzel ("Menzel"), a California resident who is President of

Motor Sports, as an individual defendant to all three causes of action. Over Motor Sports' objection, the Court granted the Motion to Amend. The Court rejected Motor Sports' argument that amendment was futile:

> Based on the evidence currently presented, the Court is not persuaded that the addition of Menzel as a defendant is wholly 'futile.'. . . [T]he Court will allow Speedsportz to amend its Complaint to add Menzel as a defendant and will decide the question of personal jurisdiction based on a fully briefed motion to dismiss. These briefs shall include more detailed arguments, citations to relevant authority regarding general and specific jurisdiction, and a more complete evidentiary record. The Court cautions Plaintiff that, based on the evidence currently presented, the Court has concerns as to whether Speedsportz will ultimately be able to meet its burden of proof. However, the Court finds that allowing amendment is, at this stage of the proceedings, in the interest of justice.

(10/17/08 Order at 4-5.)

On October 29, 2008, Speedsportz filed a Second Amended Complaint naming Motor Sports and Menzel as Defendants to the same three causes of action. On January 28, 2009, Menzel moved to dismiss all claims against him: (1) pursuant to Federal Rules of Civil Procedure 12(b)(2) ("Rule 12(b)(2)"), arguing that this Court lacks personal jurisdiction over him; and (2) pursuant to Federal Rule of Civil Procedure12(b)(3) ("Rule 12(b)(3)"), arguing that venue is not proper in the Northern District of Oklahoma. For reasons explained above, the Court grants Menzel's motion pursuant to Rule 12(b)(2) and does not reach Rule 12(b)(3).

## II.    Rule 12(b)(2) - Personal Jurisdiction

Menzel contests this Court's ability to exercise personal jurisdiction over him.[1] Speedsportz bears the burden of proving jurisdiction exists. *AST Sports Science, Inc. v. CLF Distrib., Ltd.*, 514 F.3d 1054, 1056 (10th Cir. 2008). Because the Court is not conducting an evidentiary hearing in

---

[1] Motor Sports has not contested the Court's exercise of personal jurisdiction over it.

2

connection with the motion to dismiss, Speedsportz need only make a prima facie showing of personal jurisdiction to defeat the Motion to Dismiss. *Id.* at 1056-57. Speedsportz "may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over" Menzel. *Id.* at 1057. When evaluating the prima facie case, the Court is bound to resolve all factual disputes in favor of Speedsportz in determining whether it has made the requisite showing. *Id.*

Because this case is a diversity action, the Court's ability to establish personal jurisdiction over Menzel turns upon Oklahoma law. *TH Agric. & Nutrition, LLC v. Ace European Group Ltd.*, 488 F.3d 1282, 1286-87 (10th Cir. 2007) ("To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment.") (internal quotation marks omitted). Oklahoma law "permits the exercise of any jurisdiction that is consistent with the U.S. Constitution"; therefore, the personal jurisdiction analysis "collapses into a single due-process analysis under the Constitution." *See United States v. Botefuhr*, 309 F.3d 1263, 1271 (10th Cir. 2002) (internal quotation marks omitted); Okla. Stat. tit. 12, § 2004(F) ("A court of this state may exercise jurisdiction on any basis consistent with the Constitution of this state and the Constitution of the United States."). The constitutional due-process analysis requires a two-step inquiry: (1) whether Menzel has "minimum contacts" with Oklahoma such that he should reasonably anticipate being haled into this Court; and (2) if yes, whether this

Court's exercise of personal jurisdiction over Menzel offends "traditional notions of fair play and substantial justice." *See AST Sports Science, Inc.*, 514 F.3d at 1057.[2]

To establish minimum contacts, Speedsportz must make a prima facie showing that Menzel purposefully availed himself of the privilege of conducting activities within Oklahoma. *Id.* "Purposeful establishment of minimum contacts assures a reasonable expectation in the out-of-state defendant that he might be brought into court in the state where he sought to do business and invokes the benefits and protections of the forum state's laws." *Id.* at 1057-58 (citation omitted). "In turn, the purposeful availment requirement also ensures that a defendant will not be subject to the laws of a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Id.* at 1058 (internal quotation marks omitted). Speedsportz may satisfy the "minimum contacts" standard in two ways: (1) by showing that Menzel had continuous and systematic general business contacts with Oklahoma, which would confer *general* personal jurisdiction; or (2) by showing that Menzel purposefully directed activities to Oklahoma and that Speedsportz' alleged injuries arise out of or relate to those activities, which would confer *specific* personal jurisdiction. *See id.*; *see also Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1066 (10th Cir. 2007) (explaining distinction between general and specific jurisdiction). Despite the Court's express instruction to the parties to couch future arguments in terms of general and specific jurisdiction and the Court's citation to the *Melea* decision (*see* 10/17/08 Order 4), the parties failed to do so. Out an abundance of caution, the Court will address both general and specific jurisdiction.

---

[2] As set forth below, Plaintiff has failed to make the requisite showing of minimum contacts. The Court therefore does not reach the second prong of the constitutional due-process analysis.

4

      A.      General Jurisdiction

"[I]f a defendant has continuous and systematic general business contacts with the forum state, it may be subjected to the general jurisdiction of the forum state's courts." *Melea, Ltd.*, 511 F.3d at 1066 (internal quotation marks omitted). Under the doctrine of general jurisdiction, a nonresident defendant "may be subject to a state's jurisdiction even when the alleged injury is not related to the defendant's contacts with the forum state, as long as the unrelated contacts are continuous and systematic enough that the defendant could reasonably anticipate being haled into court in that forum." *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1543 (10th Cir. 1996) (internal quotation marks omitted). According to the Tenth Circuit, the general jurisdiction standard presents "a high threshold," and courts are "equally demanding" whether the defendant is a corporation or individual. *See id.* at 1543-44.

Speedsportz' evidence consists primarily of two affidavits submitted by John Reaves ("Reaves"), President of Speedsportz. The first, dated August 18, 2008 ("First Reaves Affidavit"), explains that Michael Hammer ("Hammer"), a mutual business contact of Reaves and Menzel, introduced Reaves to Menzel approximately two to three years ago. It provides:

> [For the past two to three years,] I have had many, many business dealings with Mr. Menzel. He has offered many cars from California for me to sell for him, although none were actually shipped here for sale. Specifically, in 2006, Mr. Menzel contacted me about selling an approximate 2004-2005 highly modified Porsche turbo race car and a 355 Stredella Ferrari automobile for him. I was not able to sell those cars for him, though I offered them to many of my contacts and personally talked with Mr. Menzel many times about my efforts to sell these cars for him. He sent pictures, descriptions and back up information to me to use in selling these cars. He has also sent numerous emails from 2005 to 2006 forward to Speedsportz in Oklahoma listing the cars he has for sale and trying to get me to buy them, or try to sell them for him. From 2005 forward, Speedsportz has sent Alex Menzel and his company(ies) numerous car parts to install, service or modify . . . . Also cars have been shipped from Speedsportz in Oklahoma to Mr. Menzel and/or his companies

5

> . . . . I have also spent many hours on the phone with Alex Menzel from 2005 to 2006 forward discussing car deals . . . .

(First Reaves Aff., Ex. 2 to Mot. to Amend, at ¶¶ 3-6.)[3] Attached to the First Reaves Affidavit are: (a) a 6/26/07 Speedsportz invoice for four tires, which was sent to "Hammer International Foundation" in California[4] and reflects a "Drop Ship" to Meridian Auto Design;[5] (b) an 11/27/07 Speedsportz invoice for transportation expenses of a 1927 Bentley from Los Angeles to Tulsa, which was sent to Hammer International; (c) a 4/27/05 fax to Reaves from a Hammer International fax machine referencing "2 porsche cabs" for sale; (d) a 3/30/05 fax to Reaves from a Hammer International fax machine directing Reaves to send a transmission to "Matt Mesber" at Meridian Automotive; (e) a 6/20/06 invoice of a Virginia company, which reflects that four tires were "sold to" Speedsportz and "shipped to" Meridian Auto Design; and (f) a 6/14/06 invoice of the same Virginia company, which reflects that four tires were "sold to" Speedsportz and "shipped to" Speedsportz.

The second affidavit, dated February 27, 2009 ("Second Reaves Affidavit"), describes the events and contacts surrounding the repair work.[6] Attached to the Second Reaves Affidavit are Reaves' cellular phone records for November-December 2006, March-April 2007, and May-June

---

[3] Because it describes Menzel's general business contacts with Reaves unrelated to the repair work, the First Reaves Affidavit appears to be directed to general jurisdiction.

[4] Hammer International Foundation ("Hammer International") is a business owned by Hammer located in Los Angeles, California.

[5] Resolving factual disputes in favor of Speedsportz, Meridian Automotive and/or Meridian Automotive Design were companies owned by Menzel at relevant times.

[6] Because it describes the events surrounding the repair work, the Second Reaves Affidavit appears to be directed to specific jurisdiction.

2007 ("phone records"). Speedsportz also submitted an undated Internet article describing Menzel as owner of Meridian Automotive Design.

As an initial matter, the Court observes that "[j]urisdiction over the representatives of a corporation may not be predicated on jurisdiction over the corporation itself, and jurisdiction over the individual officers and directors must be based on their individual contacts with the forum states." *Ten Mile Indus. Park. v. W. Plains Serv. Corp.*, 810 F.2d 1518, 1527 (10th Cir. 1987). Although there may be a "fraud" exception to this general rule, *see All Am. Car Wash, Inc. v. Nat'l Pride Equip.*, 550 F. Supp. 2d 166, 169 (W.D. Okla. 1981), there are no allegations in this case that Menzel committed any fraudulent actions. Thus, the Court must analyze Menzel's personal contacts with the forum, as distinguished from Motor Sports' contacts with the forum.

Considering all above evidence and resolving any factual disputes in favor of Speedsportz, the Court finds that Speedsportz failed to make a prima facie showing that Menzel had "continuous and systematic" business contacts with Oklahoma. At best, the First Reaves Affidavit establishes that Menzel (1) solicited one Oklahoma resident to sell cars for him in Oklahoma for a three-year period from 2005-2008; (2) sent emails to one Oklahoma resident for this three-year period; and (3) spent "many hours" on the telephone with one Oklahoma resident during this three-year period. Menzel did not advertise his businesses in Oklahoma, did not own any stores in Oklahoma, and did not have any general presence in Oklahoma. Nor is it alleged that Menzel actually sold any vehicles in Oklahoma. Menzel's general business contacts with Oklahoma are fewer than contacts in cases in which the Tenth Circuit failed to find general jurisdiction. *See Trierweiler*, 90 F.3d at 1544 (holding that an individual defendant's contacts with Colorado were insufficient to confer general jurisdiction where the defendant owned a joint bank account with his mother in Colorado, belonged

7

to the Tenth Circuit bar, previously lived and owned property in Colorado, made frequent visits to Colorado, and conducted a "relatively small" amount of business in Colorado); *id.* at 1544 (citing Fifth Circuit decision holding that Texas could not assert general jurisdiction over a defendant who carried malpractice insurance through a Texas law firm for one year, did three legal projects in Texas in three years, gave a seminar in Texas, served as a pro bono consultant to a Dallas historical society, wrote a letter-to-the-editor which appeared in a Texas newspaper and a book which was circulated in Texas, and gave interviews to Texas reporters); *Melea, Ltd.*, 511 F.3d at 1068 n.7 (noting that "a defendant's correspondence with someone within the forum is typically insufficient to establish the requisite 'minimum contacts'"). At best, Menzel conducted a "relatively small" amount of business in Oklahoma, and all such contacts were with one Oklahoma resident for a limited period of time. The alleged contacts are not so continuous or systematic that Menzel could reasonably be expected to be haled into Oklahoma court for any cause of action whatsoever, which is the essence of general jurisdiction.

Further, the attachments to the First Reaves Affidavit do not support a finding of general jurisdiction because, as admitted in the First Reaves Affidavit, all such attachments relate to items sent or business directed from Oklahoma to California. (*See* First Reaves Aff., ¶ 5 ("From 2005 forward, *Speedsportz has sent Alex Menzel* . . . numerous car parts to install, service or modify on cars owned either by Speedsportz . . . .") (citing attachments A-F thereto) (emphasis added).) The invoices and faxes do not tend to prove jurisdiction because "only the defendant's own actions, directed to the forum State, are relevant to the jurisdictional question." *See Melea, Ltd.*, 511 F.3d at 1066; *see also id.* 1068 n.7 (noting that, although there was a large volume of invoices exchanged, the invoices were sent from forum state, rather than to forum state). None of the attachments to the

8

First Reaves Affidavit show or tend to prove that Menzel directed any communications to Oklahoma. Accordingly, the Court finds the evidence insufficient to establish a prima facie case of general jurisdiction over Menzel.[7]

> B.   Specific Jurisdiction

"[E]ven in the absence of continuous and systematic contacts, a state's courts may exercise specific jurisdiction over a defendant that purposefully directed its activities at the state's residents, if the cause of action arises out of those activities." *See Melea, Ltd.*, 511 F.3d at 1066 (internal quotation marks omitted). Indeed, "in proper circumstances, even a single letter or telephone call may meet due process standards" so long as that one activity creates a "substantial connection" to the forum state. *Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415, 1418-19 (10th Cir. 1988) (explaining that the exercise of jurisdiction depends on the "nature" of the contacts and whether they represent an effort by the defendant to purposefully avail himself of the forum state's law). The specific jurisdiction analysis requires a two-step inquiry: (1) whether Menzel, as an individual, purposefully directed activities at Oklahoma;[8] and (2) if so, whether Speedsportz' claims arose out or resulted

---

[7] As explained above, the Second Reaves Affidavit focuses on the repair work and is directed to specific jurisdiction. Nonetheless, the Court notes that nothing in the Second Reaves Affidavit or attached phone records support a finding of general jurisdiction over Menzel. At best, the phone records reflect a minimal number of calls from Menzel to one Oklahoma resident during a short period of time. This is by no means "continuous or systematic" contact with Oklahoma.

[8] The Tenth Circuit has instructed that the first element "can appear in different guises." *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008). In contract cases, courts "ask whether the defendant 'purposefully availed' itself of the privilege of conducting activities or consummating a transaction in the forum state." *Id.* In the tort context, courts "ask whether the nonresident defendant 'purposefully directed' its activities at the forum state." *Id.* "In all events, the shared aim of 'purposeful direction' doctrine has been said by the Supreme Court to ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state." *Id.*

9

from Menzel's activities, *i.e.*, whether a sufficient "nexus" exists between Menzel's forum-related contacts and Speedsportz' causes of action. *See TH Agric. & Nutrition*, *LLC*, 488 F.3d at 1287, 1291.

Relevant to the "purposeful direction" component of the specific jurisdiction inquiry, Speedsportz focuses its arguments on the following facts: (1) Menzel availed itself of the benefits and privileges of Oklahoma by entering a contract for repair of the Mercedes; (2) Menzel directed activity to Oklahoma by fostering a business relationship with Reaves Speedsportz that ultimately resulted in the repair contract; and (3) based on his prior relationship with Reaves and Hammer, Menzel knew that the effects of any defective repair work would be "felt" by Reaves/Speedsportz in Oklahoma, despite the fact that Hammer brought the Mercedes in for repair.

As a general rule, "[a]n individual's contract with an out-of-state party cannot, standing alone, establish sufficient minimum contacts with the forum state." *See TH Agric. & Nutrition*, *LLC*, 488 F.3d at 1287. However, contracting "parties who reach out beyond one state and create *continuing relationships and obligations* with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities." *Id.* at 1287-88 (internal quotation marks omitted) (emphasis added). "To determine whether a nonresident defendant has purposefully established minimum contacts with the forum state by contracting with another party," a court must "examine prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* (internal quotation marks omitted). "That is, the contract relied upon to establish minimum contacts must have a *substantial connection* with the forum state." *Id.* (internal quotation marks omitted) (emphasis added).

The Second Reaves Affidavit describes the creation of the repair contract:

> On or about 11/8/06, Michael Hammer called and informed me that there was a minor water leak on the [Mercedes] that appeared to originate from the head area of the engine. He delivered the car to Menzel/Meridian Motor Sports on 11/10/06.[9] At 5:00 p.m., I received a call from Menzel/Meridian Motor Sports to explain the symptoms and their proposed remedy of this minor water leak.[10] They agreed to have their Mercedes Benz mechanic, Daniel Sorrientos, call me directly and discuss the engine condition of the [Mercedes]. According to my telephone records, I received an incom[ing] call from Daniel at 5:08 pm, 11/10/06. We talked about the problem with the Mercedes and I told him about re-torquing the engine head to cure the water leak problem . . . . On approximately 11/28/06, I learned from Mr. Hammer that the cylinder head had been removed and Denial Sorrientos somehow convinced Mr. Hammer that the engine required a total and complete rebuild. . . . On approximately 2/23/07, the car was returned to Mr. Hammer and declared mechanically rebuilt and sound by Meridian/Menzel Motor Sports employees and/or Alex Menzel.

(Second Reaves Aff. (footnotes added).) Construing Reaves' evidence in a most favorable light, the repair contract was made orally during a telephone conversation between Reaves in Oklahoma and Daniel Sorrientos ("Sorrientos") in California, around November 10, 2006.[11] Sorrientos was acting on behalf of a company owned by Menzel. The contract was orally modified without Reaves' knowledge by Hammer and Sorrientos on or around November 28, 2006, and the contract work was completed around February 23, 2007.[12] (*See also* First Reaves Aff. ¶ 7 (explaining that, with respect to the repair work, Reaves "personally talked with so called mechanics and/or technicians at Mr. Menzel's company prior to the work that was completed in the car").)

---

[9] The Mercedes was thus located in California at the time the need for repair work arose.

[10] Hammer apparently informed employees of Motor Sports that Reaves was the owner of the Mercedes and instructed them to call Reaves directly in Oklahoma.

[11] There is no evidence of any written contract related to the repair work.

[12] The Second Amended Complaint alleges that the repair work began in March of 2007. This discrepancy is not relevant to the Court's analysis.

Notably, neither the First or Second Reaves Affidavit allege that Reaves had any communications with Menzel during the formation or performance of the contract. As to communications following discovery of the allegedly faulty repair work, Reaves also fails to specifically allege that he had any direct communications with Menzel. (*See* Second Reaves Aff. (describing conversations between himself or Hammer and Sorrientos in March of 2007, but failing to describe any conversations between himself or Hammer and Menzel).) Because Reaves alleges that he and Hammer communicated exclusively with Sorrientos, there is nothing in either affidavit indicating that Menzel individually directed communications to Oklahoma during the creation or modification of the repair contract, during the repair process, or following the alleged explosion of the engine.

With respect to the phone records attached to the Second Reaves Affidavit, there are four entries with the word "Menzel" written next to them. These entries reflect the same phone number. However, the Second Reaves Affidavit does not provide any supporting information or clarification as to whether this phone number is the Motor Sports number or Menzel's personal number.[13] However, even accepting as true that these calls were made by Menzel rather than another Motor Sports employee,[14] three such calls are of little relevance because they were outgoing calls made by Reaves. As to the one incoming call, Reaves has failed to provide any allegations as to what was

---

[13] According to Motor Sports, it is the Motor Sports business number.

[14] Writing the word "Menzel" next to a phone entry likely does not qualify as sworn testimony or even admissible record evidence. The Second Reaves Affidavit does not explain, verify, or support the "Menzel" entries on the phone records. Nonetheless, for purposes of this motion, the Court construed the handwritten "Menzel" as a declaration that such call involved Menzel as an individual.

said during this call or how it impacts the jurisdictional analysis. Therefore, Speedsportz has provided no allegations allowing the Court to evaluate the "nature" of this alleged contact.

There is apparently one other relevant entry on the phone records, although it did not contain a "Menzel" notation. In his response brief, Menzel admits that the phone records show one call from his personal number which was placed on April 4, 2007. (Reply in Support of Mot. to Dismiss 4.) Again, however, Reaves has failed to explain this call in his affidavits or give the Court reason to attach any particular significance to such call. Thus, for purposes of the Motion to Dismiss, Speedsportz has shown, at best, that Menzel placed two calls to Reaves during the relevant time period. Two isolated calls, with no explanation of their content or significance, are insufficient to show that Menzel reached out and made a "substantial connection" with Oklahoma in relation to the repair contract.

With respect to "prior negotiations" or "anticipated future consequences," the oral repair contract did not require any prior negotiations with Menzel and did not create an ongoing business relationship between Speedsportz and Menzel. Instead, it was an isolated contract for repair work. Although Reaves alleges, in the First Reaves Affidavit, that he and Menzel had some communications and business dealings in the past, these prior negotiations had no relation to the repair contract giving rise to the lawsuit. There is no evidence that Menzel negotiated any type of formal, ongoing business relationship with Speedsportz that would subject Menzel to Oklahoma jurisdiction for purposes of injuries arising from the repair contract. *See, e.g.*, *AST Sports, Inc.*, 514 F.3d at 1059 (holding that evidence supported finding that company's president had minimum contacts with Colorado, for purposes of breach of contract claim, where he had been physically present in Colorado prior to entry of the contract, he pursued the plaintiff in Colorado about

13

becoming his company's European distributor, he memorialized the relationship in a contract, and the relationship lasted for a period of seven years); *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1277 (10th Cir. 2005) (although parties entered into only a single agreement, such agreement required a "continuing relationship" based on the "continuing provision of services" by the party in the forum state). In contrast to these defendants, Menzel directed no actions to Oklahoma in forming the repair contract. At most, he made one or two calls to Oklahoma during the relevant time period that were related to the repair work. As to any prior activities directed at Oklahoma that established the general relationship between Reaves and Menzel, the Court finds these Oklahoma contacts insufficient to support the type of ongoing business relationship that is generally coupled with a contract to support a finding of purposeful availment, *e.g.*, the seven-year distributor relationship at issue in *AST Sports, Inc.*

In addition, the entire performance of the repair contract took place in California. According to the Second Reaves Affidavit, the Mercedes was delivered from Hammer in California to Motor Sports in California. All repairs were performed in California. Upon completion of the repairs, the Mercedes was returned to Hammer in California. The Mercedes made its way back to Oklahoma only because Reaves instructed Hammer to return it to Oklahoma. Thus, this is not a case in which any part of the contract was performed in Oklahoma. *See, e.g.*, *Pro Axess, Inc.*, 428 F.3d at 1277 (10th Cir. 2005) (fact that some "services necessary for the contract" were to be performed in Utah supported finding of minimum contacts). Nor is it a case in which performance of the contract involved transportation of the vehicle to or from Oklahoma.

In sum, as to the repair contract, Speedsportz failed to make a prima facie showing of Menzel's purposeful availment of privileges of doing business in Oklahoma. Perhaps most

importantly, there is no evidence that Menzel, rather than Motor Sports, was a party to the repair contract. There is no evidence that Menzel individually "reached out" to Oklahoma to negotiate the terms of the repair contract. There is no evidence that Menzel established any type of formal, ongoing business relationship with Reaves prior to or following entry of the repair contract. No repair work took place in Oklahoma, and the Mercedes was returned to Hammer in California upon completion of the repair work. At best, the evidence shows that (1) an agent of Menzel's company entered into an isolated contract with an Oklahoma resident for the repair of one vehicle on behalf of a Menzel-owned company; and (2) Menzel personally made two phone calls to Oklahoma during the relevant time period surrounding the repair. The Court finds this insufficient to constitute Menzel's purposeful availment by Menzel. *See Emmert Indus. Corp. v. Copeland Equip. Parts, Inc.*, No. 09-229, 2009 WL 2447550, at * 5 (D. Or. Aug. 7, 2009) (holding that Oregon did not have personal jurisdiction over Texas corporation, despite the fact that employees of Texas corporation "repeatedly interacted" with the plaintiff in Oregon via phone, email and invoices, where: (1) parties entered into an isolated repair contract which constituted a single transaction, (2) plaintiff failed to show that defendant sustained a continuing relationship with or obligation in Oregon, (3) the repair work took place exclusively in Texas, and (4) the defendant had no further contractual obligations after the repaired items left Texas). *Cf. Rambo*, 839 F.2d at 1418 (affirming dismissal of nonresident repair company where company's only connection with Oklahoma was fact that repaired property belonged to an Oklahoma resident).

Speedsportz also asserts tort claims for negligent injury to property and breach of an implied duty to complete the repairs in a workmanlike manner. As to Menzel's "purposeful direction" of activities to Oklahoma in relation to the tort claims, Speedsportz argues "[t]he actions of [Menzel]

15

have caused harm that have been felt in the forum state" and that "[t]he actions of [Menzel] were intentionally geared and calculated to continue a business relationship and derive a benefit from the resident of the forum state." (*See* Resp. to Mot. to Dismiss 14-15.) Speedsportz relies principally on the "effects test" set forth in *Calder v. Jones*, 465 U.S. 783 (1984), as recently explained by the Tenth Circuit as follows:

> Distilling *Calder* to its essence, we thus understand the Court to have found purposeful direction there because of the presence of (a) an intentional action (writing, editing, and publishing the article), that was (b) expressly aimed at the forum state (the article was about a California resident and her activities in California; likewise it was drawn from California sources and widely distributed in that state), with (c) knowledge that the brunt of the injury would be felt in the forum state (defendants knew Ms. Jones was in California and her career revolved around the entertainment industry there).

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1072 (10th Cir. 2008).

There is a fundamental flaw in Speedsportz' reliance on *Calder* and its progeny because the tort claims asserted – negligence and breach of duty to perform in a workmanlike manner – do not involve intentional or wrongful conduct. Speedsportz argues that Menzel knew the Mercedes belonged to Speedsportz, knew that Speedsportz was an Oklahoma corporation, and therefore knew that the effects of any defective repair would be "felt" in Oklahoma. However, courts have held that Calder's "effects test" has no application to negligence claims. *See Holland Am. Line Inc. v. W%20artsil%20a North America, Inc.*, 485 F.3d 450, 460 (9th Cir. 2007) ("We decline to apply *Calder* because it is well established that the *Calder* test applies only to intentional torts, not to the breach of contract and negligence claims presented here."); *Richter v. INSTAR Enter. Int'l, Inc.*, 594 F. Supp. 2d 1000, 1011-12 (N.D. Ill. 2009) (reasoning that the defendant "did not know that any tortious acts were occurring, much less direct such acts toward Illinois" and that "when it comes to the effects test mere untargeted negligence differs from intentional conduct"). Therefore,

16

Speedsportz' reliance on cases such as *Calder* involving intentional, targeted conduct to a forum state are misplaced.

Further, assuming *Calder* and its progeny have application here, Oklahoma simply cannot be considered the "focal point" of the alleged negligent repair work and its resulting harm to the Mercedes. *See Dudnikov*, 514 F.3d at 1075 n.9 (explaining that the Tenth Circuit interprets *Calder* restrictively, requiring that "the forum state itself must be the 'focal point of the tort.'") (citing *Far W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1080 (10th Cir. 1995)). The Mercedes was in California upon discovery of the need for repair work, it was repaired in California, and it was returned to Hammer in California upon completion of the repair work. In these circumstances, the fact that the negligently repaired property belonged to an Oklahoma resident is simply insufficient to support a finding that Oklahoma was the "focal point" of the tort. *See Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1172 (5th Cir. 1985) (noting that mere knowledge of selling a vehicle to an out-of-state resident was insufficient to support exercise of specific personal jurisdiction, but holding that Mississippi had jurisdiction over nonresident defendant in that case because, in addition to selling the vehicle, the defendant shipped a master cylinder to Mississippi, and the accident was caused by an alleged defect in the cylinder). *Cf. Yarbrough v. Elmer Bunker & Assocs.*, 669 F.2d 614, 617 (10th Cir. 1982) (applying former version of Oklahoma long-arm statute to fraud claim) (rejecting theory that a "defendant's amenability to suit travels with the chattel that incorporates the tortious act").

Defendant Alex Menzel's Motion to Dismiss (Doc. 37) is GRANTED.

**SO ORDERED this 8th day of September, 2009.**

*/s/ Terence C Kern*
TERENCE C KERN
United States District Judge

17